IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| Adetula, et al., Plaintiffs, vs. United Parcel Service, et al., Defendants. | Case No. 2:18-cv-00612 |

**MOTION HEARING VIA ZOOM BEFORE THE HONORABLE JUDGE HOWARD C. NIELSON, JR.**

July 28, 2025

Time: 1:30 p.m.to 2:40 p.m.

Reported by Teena Green, RPR, CRR, CBC

Orrin G. Hatch United States Courthouse
351 South West Temple, 7.430
Salt Lake City, Utah 84101
(801) 910-4092
teena_green@utd.uscourts.gov

**APPEARANCES**

FOR THE PLAINTIFF:

RANDY M. ANDRUS, ESQ.
ANDRUS LAW FIRM LLC
299 South Main Street, Suite 1395
Salt Lake City, Utah 84111
(801) 535-4645
randy@andrusfirm.com

FOR THE DEFENDANT:

MATTHEW L. LALLI
RYAN SAMUEL ALBA
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Salt Lake City, UT 84101
(801) 257-1929
mlalli@swlaw.com
ralba@swlaw.com

JENNIFER R. YEE
SNELL & WILMER LLP
One E. Washington Street, Suite 2700
Phoenix, AZ 85004
(602) 382-6565
jryee@swlaw.com

July 28, 2025 1:30 p.m.

**P R O C E E D I N G**

**THE COURT:** All right. Good afternoon. We're here for a hearing in *Adetula, et al. versus United Parcel Service, et al*. That's Case No. 2:18-cv-612.

The purpose of this hearing is to address Docket Nos. 328, the Defendant's Motion for Summary Judgment; 329, the Defendant's Renewed Motion to Exclude the testimony of Dr. Goldberg, and; 330, the Defendant's Renewed Motion to Exclude the Testimony of Mr. Tatos.

For the record, though, let's start with appearances of counsel. First counsel for the plaintiffs, Mr. Adetula and Mr. Strickland.

**MR. ANDRUS:** Yes, good afternoon, Your Honor. Randy Andrus appearing for the plaintiffs, Mr. Adetula and Mr. Strickland, who I understand are with us.

**THE COURT:** Right. Welcome, Mr. Andrus. And Mr. Strickland and Mr. Adetula, I do see them on the screen, so welcome to you all, as well.

Counsel for the defendants, United Parcel Service and United Parcel Service General Services.

**MR. LALLI:** Good afternoon, Your Honor. I'm Matt Lalli, and I'm joined by Jennifer Yee and Ryan Alba, also from our firm.

**THE COURT:** All right. Well, welcome, Mr. Lalli,

Mr. Alba, and Ms. Yee. Welcome to all of you.

Anybody else who needs to enter an appearance?

All right. Very well. It looks like the others are court personnel.

All right. At the hearing on July 1st I heard argument on the motions, and I will now rule on them.

We are on the record, and the transcript of my oral ruling will serve as my opinion on the motions. That is, although my courtroom deputy will enter a minute entry stating the disposition of the motions, there will not be a written opinion.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A fact is material if it "might affect the outcome of the suit under the governing law"; and a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." I'm quoting there from *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at page 248 from 1986.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." That's a quote from page 255 of the same case.

Ten days after my last summary judgment ruling in

this case, the Plaintiffs filed a new case concerning the events from May 1, 2018 onward, and in February 2022, I consolidated the Plaintiffs' two cases against UPS.

The new case shares five causes of action with the original case. It omits two of the causes of action included in the original case: The "pattern or practice" count and the negligent infliction of emotional distress count. And it added two causes of action that were absent from the original case: retaliation under the Family and Medical Leave Act and breach of contract. I dismissed the breach-of-contract counts in December 2023.

Where the Plaintiffs' claims in the new case are the same and they offer no new evidence that creates genuine disputes of material fact, I will grant summary judgment in favor of UPS for the same reasons I did so in my previous summary judgment rulings in this case.

All right. Based on my review of the Plaintiffs' Response to the Motion for Summary Judgment and the exhibits the parties attach to their briefing on that motion, I have identified the following new, potentially relevant evidence.

An e-mail chain from July 14th to 15th, 2019 concerning Mr. Adetula's complaints and continued employment at UPS. That's Exhibit 16 at pages 1 through 2.

Another e-mail chain from June 28th, 2018 detailing a write-up of Mr. Adetula by Mr. Lounds. That's Exhibit 14.

Deposition testimony from Ms. Hegidio admitting that she referred to Mr. Strickland as "Homer Simpson." That's Exhibit 30. The deposition page is 132, lines 15 through 23.

Documentary and deposition evidence substantiating the allegation that no African Americans working as supervisors in the Salt Lake workplace have been promoted to manager at that workplace during Mr. Lynch's or Ms. Hegidio's time there, that is, since at least 1995. That's Exhibit 32, deposition page 28, lines 11 through 16; and Exhibit 30, deposition page 88, lines 13 through 16.

Mr. Adetula's averment in his declaration that a less-experienced, less-qualified Caucasian peer was promoted to manager in September 2018, the same month he made four internal complaints of discrimination and harassment and filed an EEOC charge of discrimination. That's Exhibit 2-A, paragraphs 67 to 71 and 73 through 74.

Mr. Adetula's averment that shortly afterwards, in October 2018, Mr. Lounds gave him a negative "write-up" and "stated that he was not going to recommend [Mr. Adetula] for any manager position; he was going to prevent [Mr. Adetula] from other jobs; he threatened [Mr. Adetula] with harassment, hostility, and subjected [Mr. Adetula] to more harsh conditions than [his] Caucasian peers, interfering with and making it more difficult to perform [his] job functions and affecting [his] compensation." That's Exhibit 2-A, paragraph 72.

Mr. Adetula's averments regarding additional hostile actions taken by Mr. Lounds and Ms. Hegidio. That's Exhibit 2-A, paragraph 65.

Mr. Adetula's averment that a less-experienced, less-qualified Caucasian peer was promoted in November 2018, shortly after he made internal complaints of discrimination and harassment in late October 2018. That's the same exhibit but paragraphs 76 to 77.

Mr. Adetula's averment that he filed an amended EEOC charge of discrimination and made internal complaints in November 2018, shortly before three less-experienced, less-qualified Caucasian peers were promoted to manager. That's the same exhibit, paragraphs 78, and 83 through 84.

Mr. Adetula's averment that Mr. Lounds "maliciously destabilized, disrupted, and scrambled [Mr. Adetula's] team while [he] was out on [his] first ever approved FMLA leave, when [his] Caucasian peers who reported to Mr. Lounds, who were out on FMLA/disability leave earlier in the year," specifically, "(Joni Furlong and Kerry Swenson} did not have their teams dissolved, disrupted, disassembled, or destabilized as [his] was." That's paragraph 79 of the same document.

Mr. Adetula's averment that "Mr. Lounds and Ms. Hegidio unethically and inappropriately back-dated a document containing false accounts of events which were created in attempts to justify taking disciplinary action against

[Mr. Adetula] and encompass a date prior to [his] approved FMLA leave. This document was also saved as a 'signed document' to give the impression that it had been signed by all parties when in fact it had not been signed by [Mr. Adetula]." That's the same document, paragraph 81.

Mr. Adetula's averment that "Mr. Lounds stated to [Mr. Adetula] that [his] usage of FMLA disrupted the business operation by taking medical time out which is unacceptable and unbecoming of a UPSer." That's the same document, paragraph 82.

Mr. Adetula's averment that "[o]n or about January 13, 2019, Mr. Lounds chose again to retaliate against [Mr. Adetula] by intentionally and knowingly disrupting [his] team developments by reassigning [his] employees. [Mr. Adetula] lost all the development progression that [he] had established which [Mr. Lounds] knew had a negative impact on [Mr. Adetula's] key performance indicators, adversely and negatively impacting [his work]." That's paragraph 90.

Mr. Adetula's averment that in May 2019 and February 2020, two more less-experienced, less-qualified Caucasian peers were promoted to manager. That's Exhibit 2-A, paragraphs 92 to 93.

Mr. Adetula's averment that he was terminated in May 2020 and a termination letter supporting this averment. That's paragraph 94 of the same document; and then Exhibit 18, which

is a termination letter.

We also have Mr. Strickland's averment in his declaration that after filing his complaint in the original case in July 2018 and filing a charge of discrimination with the EEOC in September 2018, a Caucasian peer he describes as less-qualified and less-experienced was promoted to manager over him that same month. That's Exhibit 3-A, paragraphs 63 to 65.

Mr. Strickland's averment that four less-qualified and less-experienced Caucasians were promoted to manager over him in November after he filed a second charge of discrimination with the EEOC. That's paragraphs 66 to 68 of the same document.

Mr. Strickland's averment that another white co-worker, whom Mr. Strickland describes as less experienced and less qualified than he, was promoted in May 2019, the same month that Mr. Strickland made internal complaints of discrimination and harassment. That's the same document, paragraphs 71 to 73.

Mr. Strickland's averment that he filed another EEOC charge in December 2019 and another white co-worker, this one much younger than he, was promoted to an unposted managerial position in February 2020. That's the same document, paragraphs 76 to 77.

Mr. Strickland's averment that he had a stroke on

October 13th, 2019, which he attributes to stress from discrimination at work. Mr. Strickland avers that he applied for FMLA leave around that time. It is not clear, however, whether or not he received FMLA leave, because he avers that by "early 2020," he was taking sick leave when he was "falsely [accused] of excessive absenteeism [as] part of a cover up and pretext termination plan." He further avers that he was thereafter assigned to a different, less desirable department as part of this plan. That's the same document, paragraphs 75 and 182.

Mr. Strickland's averment that he was terminated when he did not sign a work-from-home agreement in April 2020. That's paragraph 183 from the same document. To be sure, UPS describes this as Mr. Strickland's taking voluntary retirement. That's Docket No. 328 at page 10, and page 35, note 4.

Also, Mr. Adetula's and Mr. Strickland's averment that three other supervisors at Salt Lake City GBS were terminated around the same time as Mr. Adetula and Mr. Strickland. The Plaintiffs aver that all three, and the Plaintiffs, were over the age of 40 and that all three had less experience in the role than Plaintiffs, significantly less than Mr. Strickland's 32 years as supervisor. Plaintiffs aver that one, Ms. Ward, had a medical condition and had used FMLA leave before. That's Exhibit 2-A, paragraphs 191 to 193; and 3-A, paragraphs 180 to 183.

All right. Based on a careful review of the evidence, the parties' briefing, and the relevant law, I conclude that the new evidence offered by the Plaintiffs, whether viewed in isolation or in combination with the evidence previously offered in the original case, falls far short of the high standards required to maintain a claim for intentional infliction of emotional distress as alleged in Count VII.

Based on the same review, I have identified no new evidence that, in isolation or in combination with the evidence previously offered in the original case, would support a reasonable jury's finding that the Plaintiffs were subject to a hostile work environment or disparate treatment on the basis of age or race as alleged in Counts I, II, III, or IV.

On these issues, I adopt the reasoning from my oral ruling on the earlier motions for summary judgment. In particular, I am adopting my reasoning as stated in Docket No. 158, the transcript of my previous ruling, from page 58, line 19 to page 63, line 8; and from page 69, line 5 to page 76, line 22.

All right. I would like to clarify my previous ruling and my ruling today in one respect, however, on this issue.

In my earlier ruling on disparate treatment and the discriminatory failure to promote count, I concluded that to the extent that a reasonable jury could find that UPS's

justifications were pretextual, it could not find that these justifications were a pretext for intentional race or age discrimination because there was a much stronger basis for inferring that those justifications were pretext for retaliation.

I certainly recognize that the Supreme Court made clear in *Reeves v. Sanderson Plumbing Products, Inc.*, that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." And I'm quoting there from 530 U.S. 133 at page 147 from 2000.

But as the *Reeves* court further explained, "[t]his is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability . . . an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision." That's page 148.

I conclude that somewhat similar reasoning applies here. As I explained in my previous summary judgment ruling, and as I will discuss further below, Mr. Adetula and Mr. Strickland have identified ample evidence to support a reasonable jury's finding that UPS's treatment of the Plaintiffs reflected retaliatory motives. By contrast, the Plaintiffs have in my view identified no more than a mere scintilla of evidence, if they have identified any evidence at

all, that UPS's treatment of the Plaintiffs reflected any sort of race- or aged-based animus or any sort of intentional race- or age-based discrimination.

Under these circumstances, I conclude that even if the jury rejected UPS's explanation for its treatment of the Plaintiffs as pretextual, it could not on that basis reasonably infer that UPS acted from an age- or race-based discriminatory purpose. Rather, if a jury concluded that UPS's proffered justifications were pretextual and further inferred that these justifications were a pretext for an illicit purpose -- and I want to be clear that I am not suggesting either that a jury would be required to reject these justifications as pretextual or, if it did so, that it would be required to infer an illicit purpose -- I conclude that the jury would be required to conclude that the rejected justifications were a pretext for retaliation.

I believe my reasoning is supported by analogy not only to *Reeves*, but also to the Tenth Circuit's recent decision in *McNellis v. Douglas County School District*. In that case, the Tenth Circuit affirmed the dismissal of a retaliation claim where the allegations strongly suggested that the actual basis for the plaintiff's termination was not retaliation but his religious beliefs. And that is 116 F.4th 1122 at page 1143 from the Tenth Circuit in 2024.

For all of these reasons, UPS's motion for summary

judgment on the Plaintiffs' claims for intentional infliction of emotional distress, hostile work environment, and disparate treatment is granted.

I will now turn to the Plaintiffs' retaliation claims.

"To prove a prima facie case of retaliation, [a plaintiff] must establish that: (1) he engaged in protected opposition to discrimination; (2) he was subject to adverse employment action; and (3) that there exists a causal connection between the protected activity and the adverse action." I'm quoting there from *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098 at page 1103 from the Tenth Circuit in 1998.

"These elements are identical for Section 1981 and Title VII actions." I'm quoting there from the same page at note 1.

"The same standard applies to ADEA retaliation claims." And I'm quoting there from *Shinwari v. Raytheon Aircraft Co.* That's a table opinion that's listed at 215 F.3d 1337, and there's an internal pagination number in the electronic version of the opinion at page *4, from the Tenth Circuit in 2000.

A parallel standard governs FMLA retaliation claims, with "protected activity" substituted for "protected opposition to discrimination" and "an action that a reasonable employee

would have found materially adverse" substituted for "adverse employment action." I'm quoting there from *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164 at page 1171 from the Tenth Circuit in 2006.

Here, UPS does not meaningfully dispute that the Plaintiffs can establish the first two elements in at least some instances. That is, although UPS disputes that the Plaintiffs were terminated at all, and that they were subject to any adverse action in connection with the FMLA claim, UPS does not dispute that the Plaintiffs engaged in protected activity, nor does it dispute that the Plaintiffs failed to receive at least some promotions.

Rather, the focus of the parties' argument is on whether the Plaintiffs have offered evidence from which a reasonable jury could conclude that retaliation was a "but-for" cause of the challenged employment action.

The Tenth Circuit has made clear that but-for cause does not mean "sole cause." I'm quoting there from *McDonald v. City of Wichita, Kansas*, 735 Fed. Appx. 529 at page 531 from the Tenth Circuit in 2018.

To the contrary, "[a]s a general rule . . . there can be multiple but-for causes of a plaintiff's injury." I'm quoting there from *Wilcox v. Homestake Mining Co.*, 619 F.3d 1165 at page 1173 from the Tenth Circuit in 2010, and that specifically is from Judge Lucero's concurring opinions.

Indeed, the Supreme Court has described but-for causation as "the minimum concept of cause." And I'm quoting there from *Burrage v. U.S.*, 571 U.S. 204 at page 211 from 2014.

As the Supreme Court explained, an act may be the but-for cause of something even "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so-if, so to speak, it was the straw that broke the camel's back." That's a quote from the same page of the same case.

"In my ruling on the summary judgment motion in the original case, I concluded that I could not say, as a matter of law, that retaliation was not a but-for cause of any of the adverse employment actions of which the Plaintiffs complain. And I stated that at Docket No. 158 at page 68, lines 7 through 14.

On a careful review of the evidence in the new case, I conclude that the Plaintiffs' new evidence only strengthens their retaliation claims.

The Plaintiffs aver that they engaged in a large quantity of protected activity after May 1, 2018, including written internal complaints and EEOC charges. That's Exhibits 10-A through 10-I, 11-A through 11-F, 12-A through E, 13-A through E. And they aver that they suffered numerous adverse employment actions, including repeated denial of promotions and, ultimately, termination.

For instance, Mr. Strickland avers that after filing the old case in late July 2018, a less-experienced Caucasian peer was promoted from supervisor to manager in September. And that's Exhibit 3-A, paragraphs 63 through 64.

Mr. Strickland further avers that he filed an EEOC charge of discrimination in September and November 2018. In November, an additional four Caucasian peers with less work experience than Mr. Strickland were promoted from supervisor to manager. And that's paragraphs 66 through 68.

Mr. Strickland avers that he took internal protected activity in May 2019, the same month that another less-experienced Caucasian peer was promoted to manager. And that's paragraphs 71 to 73.

Mr. Adetula avers that a less-experienced, less-qualified Caucasian peer was promoted to manager in September 2018, the same month he made four internal complaints of discrimination and harassment and filed an EEOC charge of discrimination. And that's Exhibit 2-A, paragraphs 67 to 71 and 73 through 74.

Mr. Adetula further avers that his negative write-up by Mr. Lounds came shortly afterwards in October 2018. And that's paragraph 72.

Mr. Adetula avers that later that October, he made internal complaints of discrimination and harassment; in November, he filed an amended EEOC charge and made another

internal complaint; and that the same month, four less-experienced, less-qualified Caucasian co-workers were promoted to manager. That's paragraphs 76 through 78 and 83 through 84.

Based on the other evidence in this case, I conclude -- well, based on this and the other evidence in this case, I conclude that a reasonable jury could infer that Mr. Adetula and Mr. Strickland applied, and were rejected, for at least some of these positions.

And taking the Plaintiffs' evidence as true, as I must for purposes of a motion for summary judgment, I conclude that the sheer quantity of protected activity and adverse employment actions identified by the Plaintiffs likely suffices to create a genuine issue of material fact regarding but-for causation, especially when considered in conjunction with the evidence offered in the original case.

Now, I made the same point in my ruling on the earlier motion for summary judgment. At the last hearing, counsel for the Defendant pushed back on this point, so I would like to further explain what I mean.

The quantity of protected activity suggests two things. First, it supports a reasonable inference that the Plaintiffs' supervisors who made the decisions to promote individuals other than the Plaintiffs were well aware of the Plaintiffs' protected activities. Second, the repeated

instances of adverse employment action, especially instances of the Plaintiffs being passed over for promotions following on the heels of protected activity over a number of years suggests a pattern that a reasonable jury could find difficult to disregard as happenstance and that could easily support a reasonable inference of retaliation.

This is particularly true for Mr. Strickland, who avers that, after the original case was filed, he was passed over for promotions on seven more occasions soon after filing three different EEOC charges. And that's Exhibit 3-A, paragraphs 64 through 77.

In addition to the sheer quantity of protected activities and adverse actions, it appears that on multiple occasions the "protected conduct [was] closely followed by adverse action." And I'm quoting there from *O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248 at page 1253 from the Tenth Circuit in 2001.

This temporal proximity suffices without more to allow a jury reasonably to infer that the Plaintiffs' protected activities played a causal role in the adverse employment actions they suffered. Indeed, the Tenth Circuit has held that "a one and one-half month period between protected activity and adverse action, may, by itself, establish causation." I'm quoting there from *Anderson v. Coors Brewing Co.*, 181 F.3d 1171 at page 1179 from the Tenth Circuit in 1999. The Plaintiffs

have presented evidence of multiple gaps at least this short.

Now, to be clear, I don't mean to suggest that a jury would have to find causation based on proximity, but under the Tenth Circuit precedent it appears that it could so find.

Further, I previously concluded that a reasonable jury could find, based on the evidence offered in the original case and discussed in my previous summary judgment ruling, that both Plaintiffs began receiving negative performance evaluations only after engaging in protected activity. My opinion on that point is Docket No. 158, and the internal page of the deposition 67, line 7 through 68, line 6.

Regardless of whether the negative evaluations themselves constitute adverse employment actions, I previously concluded that a jury could reasonably infer that the close temporal proximity between the Plaintiffs' protected activities and these negative evaluations suggests that the Plaintiffs' protected activities played a causal role in the adverse employment actions they suffered, including being repeatedly passed over for promotion. My analysis there is Docket No. 158 at page 68, lines 7 through 14.

And all of that is to say nothing of the evidence, both from the original case and the new case, concerning Mr. Lounds's statements to Mr. Adetula.

In the original case, Mr. Adetula averred that Mr. Lounds told him that he had "played victim for a long time,

and [Mr. Lounds was] going to put a stop to that and hold [Mr. Adetula] accountable." That's Exhibit 2-A at paragraph 62.

To be sure, at the last hearing, Mr. Lalli read from a transcript of a recording that Mr. Lalli represents Mr. Adetula made of that entire conversation that Mr. Lalli represents that Mr. Adetula was referring to. But counsel agreed that neither the recording nor the transcript of that recording had been attached to the summary judgment filings, and I have not found it myself. It is thus not part of the record that I may consider in deciding the motion for summary judgment. And disputes regarding the context and import of Mr. Lounds's remarks, and even whether the parties are referring to the same conversation, are almost certainly determinations for the jury in all events.

Mr. Adetula now avers that since the original case was filed, "Mr. Lounds stated to [him] that [his] usage of FMLA disrupted the business operation by taking medical time out which is unacceptable and unbecoming of a UPSer." That's Exhibit 2-A at paragraph 82.

Mr. Adetula further avers that in the negative October 2018 write-up that closely followed Mr. Adetula's September 2018 EEOC charge, Mr. Lounds "stated that he was not going to recommend [Mr. Adetula] for any manager[ial] position; [and] he was going to prevent [Mr. Adetula] from [receiving]

other jobs." That's paragraph 72.

What is more, the e-mail chains show the Corporate President of Global Business Services, Larry Darrow, raised Mr. Adetula's history of complaints and then stated that "[i]t's best if we discuss the details in person." That's Exhibit 16 at page 1. And UPS's President of International Operations and Chief Strategy and Transformation Officer, Scott Price, understood this as a directive to "legal" to "support a plan to terminate this person." That's the same exhibit at page 2.

Mr. Adetula further avers that when he did take FMLA leave, Mr. Lounds "maliciously destabilized, disrupted, and scrambled [Mr. Adetula's] team while [he] was out on [his] first ever approved FMLA leave." That's Exhibit 2-A, paragraph 79.

Taken together with the evidence offered in the original case, I conclude that the Plaintiffs' new evidence easily suffices to create a genuine dispute of material fact that defeats UPS's motion for summary judgment on the Plaintiffs' retaliation claims under Title VII, Section 1981, ADEA, and the FMLA.

For all of these reasons, UPS's motion for summary judgment on the Plaintiffs' retaliation claims is denied.

I will next turn to the Plaintiffs' disparate impact claim and the motions to exclude the testimony of Dr. Goldberg

and Mr. Tatos.

Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." I'm quoting there from *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 at page 335, note 15, from 1977.

"Proof of discriminatory motive . . . is not required." And that's a quote from the same page of the same case.

Courts analyze a disparate impact claim under a burden-shifting framework:

A prima facie case of disparate impact discrimination is established by showing that a "specific identifiable employment practice or policy caused a significant disparate impact on a protected group." That's a quote from *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301 at page 1312 from the Tenth Circuit in 1999.

Plaintiffs "may rely on statistics to show that the challenged practice or policy has the requisite disparate impact," but "any statistical analysis must involve the appropriate comparables and must 'cross a threshold of reliability before it can establish even a prima facie case of disparate impact'" And I'm quoting there from *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230 at page 1243 from the Tenth

Circuit in 1991.

"If the plaintiffs establish a prima facie case, the burden shifts to defendants to show that the challenged practice is job related and consistent with business necessity." That's a quote from the same case, *Bullington*, at page 1312 -- or actually from *Bullington*, which was the previous case I quoted from at page 1312.

"If defendant meets this burden, it is then up to the plaintiff to suggest an alternative employment practice that serves the employer's legitimate employment goals yet lacks the undesirable discriminatory effect." That's a quote from the same page.

Here, I adhere to my previous conclusion that the Plaintiffs have identified at least one facially neutral UPS policy that may have caused a significant discriminatory impact; namely, UPS's policy of filling at least some managerial level positions without posting the openings first. And that's Docket No. 158 at -- the internal page of the transcript 56, line 20 through 57, line 4 from my ruling before. This appears to be part of UPS's Management Career Opportunities process as well, which the Plaintiffs described as "a 'closed' system; the hand-picking; and the 'tap-on-the-shoulder.'" And that's discussed in the same portion of my previous oral ruling.

I also adhere to my previous conclusion that the

expert testimony of Dr. Goldberg and Mr. Tatos, if admitted, provides sufficient factual support for the Plaintiffs' claim that this practice results in an adverse disparate impact on African Americans to establish a prima facie case of disparate impact discrimination that survives summary judgment. And my analysis from my previous ruling there is from the transcript page 57, lines 7 through 13.

UPS has argued before that their "tap-on-the-shoulder" practice is job related and a business necessity because it "uses talent reviews to assess which candidates would benefit from lateral job rotations or promotions to help round out their job experience within the company" and the process is "valuable to the organization." And that can be seen at Docket No. 151 at page 16, that's where I'm quoting that from.

But as I previously concluded, the Plaintiffs have identified at least one alternative employment practice that would appear to serve the same interests identified by UPS, and that is specifically posting all manager job positions before considering the same factors otherwise considered as part of the MCO process. And I discuss that at Docket No. 158, transcript page 57, lines 21 through 25.

As before, I cannot say as a matter of law that the Plaintiffs have failed to suggest an alternative employment practice that serves the employer's legitimate employment goals

yet lacks the undesirable discriminatory effect. And I discussed that before at transcript page 58, lines 2 through 12.

By posting the jobs first, then assessing the candidates, UPS would still be able to use the same set of talent criteria to review candidates and promote candidates that they assert serve the business interests they have identified.

Indeed, posting openings first would likely increase the pool of potential candidates to choose from.

Accordingly, UPS's motion for summary judgment on the Plaintiffs' disparate impact claim is denied.

I will now address the motions to exclude the expert testimony.

At the summary judgment stage and without expert voir dire where Dr. Goldberg and Mr. Tatos can testify and be examined by the parties, I am hesitant to attempt to decide whether the expert testimony of Dr. Goldberg and Mr. Tatos reflects "scientific knowledge" that is "not only relevant, but reliable." I am quoting some of that language from *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 at pages 589 to 590 from 1993.

This is particularly so because a trial would still be necessary to resolve the retaliation claims in this case even if I excluded the expert testimony.

What is more, at least part of the dispute over the reliability of Mr. Tatos's opinions turns on whether the final performance evaluations were tainted by retaliatory motives. Thus, to the extent UPS's argument for barring Mr. Tatos's testimony rests on Mr. Tatos's decision to exclude these final evaluations from his data, that argument is inconsistent with my ruling that the retaliation claims raise genuine disputes of material fact to be decided by the jury.

And to the extent that UPS's argument for excluding Dr. Goldberg's opinions is that they would not be helpful to the jury, I am inclined to say that at least her testimony regarding the availability of alternatives to UPS's at least partially closed system of promoting managers and on the drawbacks of a closed system in terms of access for women and minorities would be helpful to the jury.

To be sure, none of what I have said should be construed as ruling on these motions. Rather, for the reasons I have given before, I intend to decide these motions once the case has been set for trial.

For now, however, UPS's renewed Motions to Exclude the Testimony of Dr. Goldberg and Mr. Tatos are denied without prejudice.

I will now address punitive damages for the claims on which I have not granted summary judgment.

It is true, as UPS notes in its reply brief, that the

Plaintiffs failed to address UPS's legal arguments regarding punitive damages expressly in their response brief. But UPS's arguments that punitive damages are not available on the Plaintiffs' Title VII and Section 1981 claims rests on its view that the undisputed material facts foreclose such damages. And the Plaintiffs did expressly contest the supposedly undisputed facts on which UPS's argument rests. I conclude that this is adequate, if only barely so, to preserve the Plaintiffs' opposition to UPS's argument.

Turning to the merits of this argument, I conclude that I cannot say that a reasonable jury could not properly award punitive damages on the Plaintiff's Title VII and Section 1981 retaliation claims.

The question in Title VII cases is whether UPS acted with "malice" or "reckless indifference" to the Plaintiffs' federally protected rights. And I'm quoting there from *Kolstad v. American Dental Association*, 527 U.S. 526 at pages 535 to 536 from 1999.

In order to justify an award of punitive damages under Section 1981, "the discrimination must have been malicious, willful, and in gross disregard of the rights of the plaintiff," and a plaintiff must accordingly "prove that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination." I'm quoting there from *Guides, Ltd. v. Yarmouth Group Property*

*Management, Inc.*, 295 F.3d 1065 at page 1077 from the Tenth Circuit in 2002.

If the jury finds that UPS retaliated against the Plaintiffs in violation of Title VII or Section 1981, I conclude that the jury could also reasonably find that UPS acted with malice or reckless indifference to the Plaintiffs' rights or in willful or gross disregard of those rights.

Indeed, the evidence offered by the Plaintiffs contains e-mails that a reasonable jury could reasonably interpret to show the Plaintiffs' managers planning to punish the Plaintiffs for their complaints and to cover their tracks in doing so. Mr. Price responded to a description of Mr. Adetula's protected complaints by offering "legal['s] support" in the form of "a plan to terminate this person." And Mr. Darrow specified that it was best if the managers "discuss[ed] the details in person."

To be sure, a reasonable jury could also find that these e-mails were innocent responses to the challenges of an underperforming employee. But I conclude that a reasonable jury could find as well or instead that these e-mails evince knowing hostility to the Plaintiffs' federal rights.

I likewise reject UPS's argument that my rejection of the Plaintiffs' claim for intentional infliction of emotional distress forecloses their request for punitive damages under Title VII and Section 1981. In rejecting that common law tort

claim, I concluded that the Plaintiffs have not identified evidence that could support a reasonable jury's finding that UPS or its employees acted so "outrageous[ly] and intolerabl[y]" as to offend "generally accepted standards of decency and morality." And I'm quoting there from *Franco*, 21 P.3d at 207. That is a different legal standard from whether UPS acted with malice, reckless indifference, or gross or willful disregard of the Plaintiffs' federal rights. As the Utah Supreme Court has noted, "an act is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." And that's a quote from the same page of *Franco*.

Unlike its argument regarding punitive damages under Title VII and Section 1981, UPS's argument that punitive damages are unavailable under the FMLA is a purely legal argument, not an argument regarding whether genuine disputes of material fact do or do not foreclose summary judgment. By failing to address this legal argument in their response to UPS's motion for summary judgment, the Plaintiffs may well have waived any response that they could have made.

Regardless, I conclude that punitive damages are not available under the FMLA as a matter of law. The Northern District of Oklahoma has held so explicitly in *Jurczyk v. Coxcom, LLC*, which can be found at 191 F.Supp.3d 1256 at page

1269 for the Northern District -- as I said, the Northern District of Oklahoma, in 2016.

That ruling was based in part on the Tenth Circuit's explanation in *Walker v. United Parcel Service, Inc.* that "courts have consistently refused to award FMLA recovery for such other claims as consequential damages and emotional distress damages." That case can be found at 240 F.3d 1268 at page 1277 from 2001. The District of New Mexico came to the same conclusion in *Saavedra v. Lowe's Home Centers, Inc.*, which can be found at 748 F.Supp.2d 1273 at page 1298, and that's from 2010.

And all of that is consistent with the Supreme Court's characterization of the cause of action under the FMLA as "a restricted one" under which recoverable damages "are strictly defined and measured by actual monetary losses." And I am quoting there from *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 at pages 739 to 740 from 2003.

UPS's argument that punitive damages are not available under the Age Discrimination in Employment Act is likewise a purely legal argument. And again, the Plaintiffs may well have waived any response they may have had to this argument by failing to address it in their response to UPS's motion for summary judgment.

Regardless, I conclude that UPS is correct that punitive damages are unavailable as a matter of law under the

ADEA. The Tenth Circuit so held in *Bruno v. Western Electrical Co.*, which can be found at 829 F.2d 957, pages 966 to 967 from the Tenth Circuit in 1987.

UPS's argument that it is entitled to summary judgment that the Plaintiffs cannot recover liquidated damages under the ADEA is not, however, a purely legal argument. Rather it rests on the same supposedly undisputed material facts on which UPS relies in seeking summary judgment regarding the availability of punitive damages under Title VII and Section 1981. By contesting these supposedly undisputed facts, I again conclude that the Plaintiffs preserved their opposition to UPS's argument on this issue, if only barely so.

Liquidated damages are available if the "violation of the ADEA is willful," that is, "if the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." And I am quoting there from *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 at page 128 from 1985. For the same reasons I rejected UPS's arguments that a reasonable jury could not find it liable for punitive damages under Title VII and Section 1981, I conclude that I cannot say that no reasonable jury could conclude that UPS acted willfully in retaliating against the Plaintiffs' protected ADEA activity.

For all of these reasons, UPS's motion for summary judgment is granted with respect to the punitive damages under the FMLA and the ADEA, and denied with respect to punitive

damages for the Plaintiffs' retaliation claims under Title VII and Section 1981 and with respect to liquidated damages under the ADEA.

It is so ordered.

All right. That is my ruling. Are there any questions about it? Any questions from the plaintiff, Mr. Andrus?

You're on mute, sir.

**MR. ANDRUS:** Sorry. Yes. So is Your Honor ruling as to the FMLA cause of action that the motion is denied?

**THE COURT:** With regard to your retaliation under the FMLA, yes. It is denied with respect to the retaliation under that.

**MR. ANDRUS:** Gotcha. Okay. Thank you.

**THE COURT:** Okay. Any other questions?

**MR. ANDRUS:** I don't have any other questions.

**THE COURT:** Okay. Does counsel for the defense -- Mr. Lalli, Mr. Alba, Ms. Yee, do any of you have any questions about that?

**MR. LALLI:** I think I understand your ruling, Your Honor.

**THE COURT:** Okay. Very well. Give me one second.

All right. Okay. Now, given my ruling, we probably need to start talking about a trial schedule and the logistics for that.

Is there any disagreement there?

**MR. ANDRUS:** Not from plaintiff, no.

**MR. LALLI:** Nor from the defense.

**THE COURT:** All right. Given the heavy demands on my criminal docket this year and last, I have a significant backlog of civil cases awaiting trial. And quite candidly, I almost certainly would not be able to hold a trial in this case until the second half of 2026, so about a year from now would be the earliest.

But if both parties consent, it almost certainly would be possible for a magistrate judge to hold the trial much earlier than I could. A magistrate judge might even be able to schedule the trial so that it would begin as soon as both parties are ready.

Please do not tell me your thoughts about the option of a consent trial before a magistrate judge right now. But please do consult with each other and your clients and file a status report within 30 days letting me know whether the parties are interested in pursuing that option and I'll consent to that.

I would encourage you to take the possibility of that option seriously. The magistrate judges in this district are all excellent, and I'm confident that any one of them would do a great job in presiding over a trial in this case. And because by statute they may not try felony criminal cases, they

have much more availability for trials than I have. I'm required under the Constitution and by law to give priority to criminal trials over civil trials, for better or for worse, but the magistrate judges do not have that conflict.

Even so, it is something the parties have to consent to. And if either or both parties do not consent to the option of a trial before a magistrate judge, please tell me that as well. But please do not tell me which party or parties objected.

Any questions about that?

**MR. ANDRUS:** Your Honor, would that be on a random assignment among the magistrate judges or was there one identified?

**THE COURT:** Well, presumptively, it would be the magistrate judge assigned to this case, but if the parties requested, I could arrange for it to be a random draw. So that's something you could address as well.

**MR. LALLI:** Okay.

**THE COURT:** But, yeah, the default would be the magistrate judge assigned to the case, but that doesn't have to be the case. So if the parties have a view about that, you know, if you'd prefer a random draw, I could do that.

But as I said, please do take that seriously. I've just had an awful lot of criminal cases demanding space on the docket for trial and I just -- the backlog for getting a civil

trial is unfortunately much longer than it should be for me. But we do have that option that can really alleviate things and move things along if you're willing to take it, so please do seriously consider that.

I also want to go over a few other things. To the extent you don't know the answers today, that's fine, you can address these things in the status report in addition to talking about whether the parties consent to a trial before a magistrate judge.

The first question is whether it would make sense for the parties to engage in any further settlement negotiations or mediation in light of my ruling today.

Do the parties have thoughts about that?

**MR. ANDRUS:** From Plaintiffs' point, we can certainly give that some serious thought with counsel and maybe include that in our status report.

**THE COURT:** Yeah, I'd request that you do that. I mean, you're aware we can do that and -- I mean you can bend a lot of ways. Our court has a program where we can refer a case to a magistrate judge for a settlement conference. Now, in that case, it is randomly assigned to someone other than the assigned magistrate judge. So it's someone who would be looking at the case for the first time and not have been involved in any of the discovery or things like that. That's an option that is a quite economical and efficient way of

engaging in mediation. Of course, there's many other options, including just informal discussions among yourselves, hiring a private mediator, you know, there's all sorts of things that you could pursue. But if that's something you're interested in, please address that in your status report.

**MR. ANDRUS:** Your Honor, I know the last time we visited that with Your Honor, there was a situation where both sides did a simultaneous exchange of offers that seemed to be -- and that was before Mr. Lalli and his firm was involved, but that may be something as well that could be put on the table.

**THE COURT:** Right. Well, again, I think -- you know, I would be inclined to defer to the -- you know, whatever -- for example, if you have had -- if you were interested in having a settlement conference before a magistrate judge, I'd be inclined to let the magistrate judge and the parties work out how that conference would work and the timing of submissions and offers and things. And you know if you -- with a private mediator, that's something I would probably be inclined to defer to whoever is handling the mediation or settlement. But that's something you can address in the status report.

Next, I don't -- other than the *Daubert* motions, which eventually I'm going to have to decide, you know, and, you know, once -- if -- you know, if this is referred to a --

if the parties consent to trial before a magistrate judge, I'd probably be inclined to let the magistrate judge address those, too. Though I guess it wouldn't have to be that way. You could address that. But if you all decide to go to trial before me, I probably -- once we have a trial date I would just try and set a hearing on the *Daubert* motions so we could get those resolved before trial.

But apart from the *Daubert* motions that I assume will be renewed, and apart from just kind of standard pretrial practice, things like disclosures and motions in limine and that sort, do the parties anticipate anything else, any other motions that would likely need to be addressed before trial?

**MR. ANDRUS:** I don't believe so, Your Honor, other than those.

**MR. LALLI:** We would anticipate significant motions in limine.

**THE COURT:** Right. Okay. But that would be -- I will -- you know, again, if there's a consent trial, the magistrate judge will do something similar, I'm sure -- if it's a trial before me, I'll issue a trial order in advance of the trial date which will have deadlines for things like motions in limine and so forth. But, again, if that's -- if you can think of anything else, that's something else to address in the status report.

Third, my recollection is that the plaintiffs have

requested a jury trial.

Is that still correct, Mr. Andrus?

**MR. ANDRUS:** Yes, Your Honor.

**THE COURT:** And I believe at the last status conference the parties indicated they would need approximately 90 days to prepare for trial once we're in a position to set a trial date.

Is that still right?

**MR. ANDRUS:** Yes. Yes.

**THE COURT:** What about -- you know, what I'm saying is I'm not ready to set a trial date today, but when we're ready to sit down and set a trial date, about how much lead time would you need to get geared up and ready to go to trial? Does that make sense?

**MR. ANDRUS:** Right, yeah, 90 days is probably okay once, you know, we give that green light to Your Honor, I think.

**THE COURT:** Right. And, Mr. Lalli, do you have a different view? Would you need more than 90 days or is that sufficient for --

**MR. LALLI:** I think the Court is -- whether, Judge, that's you or a magistrate judge -- is going to want a significant amount of time to address the motions in limine that we have in mind. And so I'm -- we could be ready to go within 90 days.

You know, perhaps one solution would be to address those motions in limine sooner, but I do -- I do believe that it's going to take quite a bit of effort by us and by the Court to address those.

**THE COURT:** Okay. So you think -- and perhaps that's something you could address more -- in more detail in the status report. But I think -- I gather you're suggesting that as a practical matter once the trial date's set there will probably need to be more time than 90 days built in just to be able to address the motions in limine if they're not addressed before?

**MR. LALLI:** What I would actually prefer is, whenever the trial is scheduled, that we have a motion in limine process that is sufficient for both the parties and the Court to address them.

**THE COURT:** Right.

**MR. LALLI:** And that could be -- when I think of preparing for trial, a motion in limine is usually just a small part of that. And if we were to take that out of it, we would easily be prepared for trial within 90 days.

I just think that the motions in limine we have in mind, given the volume, the sheer quantity, as the court refers to it, that's going to take some time.

**THE COURT:** Yeah, no, I understand. Okay. Well, maybe you can flesh that out. If you have proposals for how to

address those or suggestions about how much time we need to build into that, perhaps you could flesh that out in the status report.

**MR. LALLI:** Sure.

**THE COURT:** And to be clear, I want a joint status report, but that doesn't mean that the parties can't like set out competing or different views on different issues. Like, you know, I want it to address -- a joint status report that addresses all of these things, but it could say things like, you know, "the plaintiffs think," "the defendants think," or something like that. So you don't have to actually agree on everything, just I just want it all to be in one document.

Does that make sense?

**MR. LALLI:** It does.

**MR. ANDRUS:** Yeah.

**THE COURT:** Okay. The final thing I want to ask, and again if you want to elaborate in the status report, I think the plaintiffs indicated they expected the trial to take 15 days. Last time, the defense counsel said five days.

I guess, you know, given these -- you know, what Mr. Lalli is saying about, you know, significant motions in limine, maybe it's hard to figure out how long trial would take because maybe that would affect the length of trial substantially.

But do you have estimates as you sit here right now

about how much time you think we'd be looking at?

**MR. ANDRUS:** From the Plaintiffs' point view, I think in the attorneys' planning report and the Court's scheduling order, I think we indicated 20 days. I may have last time indicated 15 days kind of in light of some of this. So that's still my latest thinking.

**THE COURT:** Okay. And you said 15 days last time but --

**MR. ANDRUS:** Yeah.

**THE COURT:** -- that didn't involve the new case that was pre-consolidation.

Okay. And do you have a sense, Mr. Lalli? And, you know, maybe give me a range, depending on how successful your motions in limine are going. Do you have any thoughts about --

**MR. LALLI:** Well, I do, Your Honor, and they're different from what I previously had. You know, we've had opportunities to take discovery, particularly depositions of the plaintiffs. And I would anticipate that each of the plaintiffs will take a substantial amount of time to examine and cross-examine.

And so I do not disagree with a 15- to 20-day estimate, particularly if we're on the 8:30 to 1:30 schedule.

**THE COURT:** Okay. Well, I'm going to ask you then to -- you know, as you think more about that, I'll write that down, but as you think more about that, if you -- you know, if

you want to refine that a little bit or explain it a little bit more, you could address that in the status report, too.

So again, I guess the topics for the status report are, first of all, whether the parties both consent to trial before a magistrate judge.

Next, whether the parties are interested in engaging in further settlement or mediation.

Next, you know, issues that you foresee that need to be resolved before trial.

Next, you know, any thoughts about whether -- you know, how much time would be needed to prepare for trial once the trial is -- once the parties are ready to set the trial, and that's -- I guess in connection with that you could address, you know, your thoughts about how to build in time to address the motions in limine that Mr. Lalli has indicated the defendants will be filing.

And then finally, if you have any additional thoughts about the amount of time the trial would take apart from this 20-day per Mr. Andrus or 15- to 20-day per Mr. Lalli's estimate.

Any questions about what I'm looking for in the status report?

**MR. ANDRUS:** No. No, I think that's it. Thank you, Your Honor.

**THE COURT:** Right. Well, as I said, please do give

serious thought to the possibility of a consent trial with a magistrate judge, though. I think that would be -- as a calendaring matter, that would just be a lot easier and more efficient for everyone. I'm confident that any of the magistrate judges could do a terrific job.

Are there any other questions about anything we've discussed?

**MR. ANDRUS:** Not from plaintiffs, no.

**MR. LALLI:** Not from me either.

**THE COURT:** All right. Anything else we need to address at this time?

**MR. ANDRUS:** No.

**THE COURT:** Mr. Lalli, anything else from you?

**MR. LALLI:** No. No. Thank you.

**THE COURT:** All right. Very well. Thank you. Court is adjourned.

**MR. ANDRUS:** Thank you, Your Honor. Have a great day.

**THE COURT:** Thank you.

**MR. ANDRUS:** Bye.

(Concluded at 2:40 p.m.)

CERTIFICATE OF COURT REPORTER

This is to certify that the proceedings in the foregoing matter were reported by me in stenotype and thereafter transcribed into written form;

That said proceedings were taken at the time and place herein named;

I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

In witness whereof I have subscribed my name this 28th day of July 2025.

Teena Green

________________________________

Teena Green, RPR, CSR, CRR, CBC